# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **AMERICAN LAFRANCE, LLC,** | Case No. 08-10178 (BLS) |
| Reorganized Debtor. | |
| **AMERICAN LAFRANCE, LLC,** | Adv. No. 10-51245 |
| Plaintiff, | Related to Adv. Docket Nos. 1, 25, 26, 28, 35, 40, 58, 65, 70, and 71 |
| v. | |
| **RT JEDBURG COMMERCE PARK, LLC,** | |
| Defendant. | |

Christopher A. Ward
Justin K. Edelson
Shanti M. Katona
POLSINELLI SHUGART PC
222 Delaware Ave., Suite 1101
Wilmington, DE 19801

David Drez
WICK PHILLIPS GOULD & MARTIN, LLP
100 Throckmorton Street
Fort Worth, TX 76102

Ian T. Peck
Abigail Ottmers
HAYNES AND BOONE, LLP
2323 Victory Ave., Suite 700
Dallas, TX 75219

*Counsel for American LaFrance, LLC*

Bonnie Glantz Fatell
Victoria Guilfoyle
BLANK ROME LLP
1201 Market Street, Suite 800
Wilmington, DE 19801

Paula K. Jacobi
BARNES & THORNBURG LLP
One North Wacker Drive, 44th Floor
Chicago, IL 60606

*Counsel for RT Jedburg Commerce Park LLC*

# OPINION[1]

Before the Court is an adversary proceeding initiated by American LaFrance, LLC ("ALF" or the "Debtor") primarily to resolve its objection to the $8 million claim (the "Claim") [Docket No. 939, Proof of Claim No. 1003] filed by RT Jedburg Commerce Park, LLC ("RT Jedburg"). RT Jedburg filed a motion for summary judgment (the "Motion") [Adv. Docket No. 25] asking the Court to overrule the objection. For the reasons set forth below, the Court will deny the Motion and will disallow the Claim.

## I. BACKGROUND

On January 28, 2008 (the "Petition Date"), ALF filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Before the Petition Date, ALF and RT Jedburg entered into a lease agreement (the "Lease") under which RT Jedburg agreed to lease to ALF two industrial buildings located in Summerville, South Carolina (collectively, the "Premises"). The Lease was executed on or about August 4, 2006 and amended on January 26, 2007. The Lease required ALF to construct certain additions inside a building on the Premises that was specifically designed to facilitate the manufacture, assembly, and painting of emergency and commercial vehicles. ALF hired various contractors to construct these additions, but when ALF later defaulted on its payment obligations, work on the Premises ceased and the contractors filed various mechanic's liens against the Premises.

Pursuant to its Third Amended Plan of Reorganization (the "Plan") [Docket No. 392], the Debtor moved to assume the Lease [Docket No. 512]. RT Jedburg filed its objection to Plan confirmation and to the Debtor's assumption of the Lease [Docket No. 525], asserting that the Debtor had not cured its defaults under the Lease. To resolve the dispute between the parties concerning Lease assumption, the parties negotiated the terms of a stipulation (the "Agreed Order") [Docket

---

[1] Pursuant to Federal Rule of Bankruptcy Procedure 7052, this Opinion constitutes the Court's findings of fact and conclusions of law.

No. 686] pursuant to which the Debtor was authorized to assume the Lease, subject to certain "assumption cure requirements" (the "Cure Provision"). Generally, the purpose of the Cure Provision was to ensure that ALF completed its construction obligations with respect to the manufacturing building on the Premises. The Cure Provision provided as follows:

> ALF shall be required to have completed all work that is required to obtain a permanent Certificate of Occupancy ("CO") permitting installation of equipment and furnishings and operation and occupancy of the Premises by no later than August 31, 2008. ALF shall be required to receive the CO from Berkeley County no later than October 31, 2008. The CO may be subject to conditions imposed by Berkeley County and as allowed by the 2003 International Building Code Chapter 1 Paragraph 110.2 and 110.3. *To protect RT Jedburg from the consequences of ALF failing and in the event that ALF fails (i) to complete all of the work that is required to obtain the CO for the Premises by August 31, 2008 and/or (ii) to have the CO for the Premises issued to it by October 31, 2008, RT Jedburg shall have an allowed Class 4 unsecured claim in the amount of $8 million (the "Claim").* The Claim shall be reserved for and paid in the same manner as all Class 4 unsecured claims are reserved for and paid under the Plan except as modified by the Order confirming the Plan.

Agreed Order ¶ 5 (emphasis added). Upon entry of the Agreed Order, the Debtor resumed construction on the Premises in an effort to fulfill its obligations under the Cure Provision and ultimately obtain a permanent certificate of occupancy (the "CO") for the manufacturing building.[2] As noted, the Agreed Order provided that ALF must "complete all of the work that is required to obtain the CO for the Premises

---

[2] Before the Petition Date, ALF had obtained a temporary certificate of occupancy to occupy and operate the manufacturing building on the Premises while awaiting receipt of a permanent certificate of occupancy.

by August 31, 2008" (the "Work Deadline") and that ALF "have the CO for the Premises issued to it by October 31, 2008" (the "CO Deadline").

Sometime in late August 2008, Daniel Warsowick, on behalf of ALF, called Brian Welcker, who represented RT Jedburg, to inform him that ALF did not expect to complete the necessary construction by the Work Deadline. Mr. Welcker confirmed this conversation via an email dated August 26, 2008, requested to be advised of the date "on or about which [Mr. Warsowick] anticipated this work may be completed," and notified that Mr. Warsowick that he intended to inspect the Premises shortly. Mr. Warsowick responded in an email dated August 28, 2008 that "all work associated with obtaining the CO will be completed by the Friday of Sept. 19th," and that ALF intended to schedule a preliminary inspection with a Berkeley County building inspector the county sometime before that date.[3] On September 26, 2008, the Debtor passed the inspection by the Berkeley County building inspector, and by September 29, 2008, the Debtor had obtained the CO, more than a month before the CO Deadline.

On September 18, 2008, however, RT Jedburg filed the Claim in the Debtor's bankruptcy case. RT Jedburg asserts that it is entitled to payment on the Claim because the Cure Provision states that "RT Jedburg shall have an allowed Class 4 unsecured claim in the amount of $8 million" in the event that the Debtor failed to meet the Work Deadline. The Debtor objected to the Claim.

On June 15, 2010, the Debtor commenced this adversary proceeding by filing its complaint (the "Complaint") [Adv. Docket No. 1] against RT Jedburg to supplement its objection to the Claim. By the Complaint, the Debtor seeks (1) a declaratory judgment stating that the Debtor satisfied the provisions of the Agreed Order ("Count I"); (2) an

---

[3] Since then, however, the parties have disputed whether ALF completed all necessary work that was required to meet the Work Deadline. The Court notes that ALF has objected to the admission of the trial exhibits submitted by RT Jedburg that document this email exchange on the ground that they are hearsay. The Court concludes, however, that RT Jedburg may properly offer Mr. Warsowick's email as an admission by a party-opponent.

order disallowing the Claim under 11 U.S.C. § 502 ("Count II"); and (3) reasonable attorneys' fees and expenses in the event that the Debtor prevails on Count I and Count II ("Count III"). RT Jedburg filed a motion to dismiss the Complaint, which the Court has previously denied [Adv. Docket No. 12]. Shortly after RT Jedburg filed its motion for summary judgment, the Court scheduled a two-day trial in this matter. Trial was held, after which the parties submitted their respective proposed findings of fact and conclusions of law.

This matter has been fully briefed and argued, and the Court has admitted relevant testimony and exhibits on the matter.[4] It is now ripe for decision.

## II. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of this adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (M).

## III. DISCUSSION

To resolve the dispute between the parties relating to the Claim, the Court must interpret the Agreed Order and determine if and to what extent the Debtor may be liable to RT Jedburg on account of the Cure Provision. With respect to their enforcement, agreed orders are generally treated as contracts. *Enter. Energy Corp. v. United States (In re Columbia Gas Sys., Inc.)*, 146 B.R. 106, 113 (D. Del. 1992) (holding that it is appropriate to treat a judicially-approved settlement agreement like a contract in the bankruptcy context) (citations omitted). This Court has previously held that "[w]hen construing an agreed or negotiated form of order . . . the Court approaches the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order."

---

[4] The Court notes that the Debtor has objected to the admission of certain trial exhibits submitted by RT Jedburg on hearsay grounds. But given that the Court has not relied upon any exhibits whose admissibility has been contested by the Debtor, with the exception of the exhibit referenced and ruled on in footnote 3, the Court need not rule further on the Debtor's objections.

*In re Trico Marine Servs, Inc.*, 450 B.R. 474, 482 (Bankr. D. Del. 2011). *See also City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 (6th Cir. 1995) ("An agreed order, like a consent decree, is in the nature of a contract, and the interpretation of its terms presents a question of contract interpretation."). Ultimately, "the goal is to determine the rights, duties, and reasonable expectations of the parties, as disclosed to and blessed by the Court." *In re Trico*, 450 B.R. at 482.

### A. Choice of Law[5]

It is well settled that a federal court applies the choice of law principles of the state in which it sits. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981); *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 307 (1981). The Delaware Supreme Court has stated that determining that state whose law applies to the interpretation of a contract requires assessing which state "has the most significant relationship to the transaction and the parties." *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 46-47 (Del. 1991); *Oliver B. Cannon & Son, Inc. v. Door-Oliver, Inc.*, 394 A.2d 1160, 1166 (Del. 1978). Factors that should be considered in this analysis include the place of contracting, the place of negotiation, the place of performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties. *See* Restatement (Second) Conflict of Laws § 188. Here, the Court concludes that South Carolina contract law applies to the interpretation of the Agreed Order because South Carolina is the state in which the Premises is located—the subject matter of the Agreed Order—and the state in which performance under the Agreed Order was due.

---

[5] The Third Circuit instructs courts to first determine if there is an actual conflict between competing state laws before proceeding with a choice-of-law analysis. *Oil Shipping B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 1015, 1018 (3d Cir. 1993). The parties have not argued that there is an actual conflict and no such conflict is apparent to the Court. Nonetheless, the Court engages in a brief choice-of-law analysis because the Debtor has argued that South Carolina law, while RT Jedburg has argued that Delaware law applies.

**B. The Cure Provision**

Having found that South Carolina law applies, the Court now turns to the Agreed Order to determine whether the Debtor is liable to RT Jedburg on account of the Cure Provision. The South Carolina Supreme Court has stated that "[w]here an agreement is clear on its face and unambiguous, 'the court's only function is to interpret its lawful meaning and the intent of the parties as found within the agreement.'" *Miles v. Miles*, 711 S.E.2d 880, 883 (S.C. 2011) (quoting *Smith-Cooper v. Cooper*, 543 S.E.2d 271, 274 (S.C. Ct. App. 2001)). However, "if the agreement is ambiguous, it is the court's duty to determine the intent of the parties. Id. (citation omitted). Thus, the Court must determine if the Agreed Order is ambiguous before proceeding with its analysis. Under South Carolina law, "[a]n agreement is ambiguous if it is susceptible to more than one interpretation or its meaning is unclear." *Id*.

**1. Ambiguity**

The Court finds that the Cure Provision in the Agreed Order is indeed ambiguous. Specifically, the Court concludes that the following key sentence, which is at the heart of the parties' dispute, is sufficiently unclear because of its use of the phrase "and/or":

> To protect RT Jedburg from the consequences of ALF failing and in the event that ALF fails (i) to complete all of the work that is required to obtain the CO for the Premises by August 31, 2008 *and/or* (ii) to have the CO for the Premises issued to it by October 31, 2008, RT Jedburg shall have an allowed Class 4 unsecured claim in the amount of $8 million (the "Claim").

Agreed Order ¶ 5 (emphasis added).

RT Jedburg asserts that the phrase "and/or" is commonly used to mean "either" or "both." The Court concurs. *Dynalectron Corp. v. Equitable Trust Co.*, 704 F.2d 737, 739 & n.3 (4th Cir. 1983) (citations omitted) (finding that "a virgule [— "/"—] normally is used to separate alternatives"); *Local Div. 589, Amalgamated Transit Union, AFL-CIO, CLC v. Commonwealth of Mass.*, 666 F.2d 618, 627 (1st Cir. 1981) (finding that "the words 'and/or' commonly mean 'the one or the other or both'");

*Redfield v. Peat, Marwick, Mitchell & Co. (In re Robertson)*, 115 B.R. 613, 625 (Bankr. N.D. Ill. 1990) (finding that "and/or" refers to either one of two alternatives or both). And therein lies the problem.

Given the meaning of the phrase "and/or," its use in the Cure Provision renders the following three interpretations of when the Debtor would become liable to RT Jedburg: (1) if the Debtor fails to meet the Work Deadline and the CO Deadline; (2) if the Debtor fails to meet just the Work Deadline; or (3) if the Debtor fails to meet just the CO Deadline. Put another way, if the dual requirements are read in the conjunctive, then RT Jedburg is entitled to the Claim only if the Debtor fails to meet both deadlines. If read in the disjunctive, then RT Jedburg is entitled to the Claim if the Debtor fails either one of the deadlines—but just one nonetheless.[6] The problem, however, is that the use of the virgule makes both readings applicable, and consequently, makes it impossible to assess from the words themselves when RT Jedburg would be entitled to the Claim, and more importantly, when it would not be. It is precisely for this reason that the Court concludes that the phrase "and/or" creates an inherent ambiguity in the Cure Provision that cannot be ignored. Another bankruptcy court was equally troubled by the use of the phrase "and/or" in a court's findings of fact, which stated that "a claim for money and services obtained by false pretenses, false representations, fraud or defalcation, and/or willful and malicious injury," because it was unclear whether such claim was "based on some, possibly all, [or] perhaps only one of the enumerated causes of action." *Simmons Capital Advisors, Ltd. v. Bachinski (In re Bachinski)*, 393 B.R. 522,

---

[6] RT Jedburg insists that the phrase "and/or" means that RT Jedburg would be entitled to the Claim if the Debtor defaulted on either deadline or both. RT Jedburg also insists that the Debtor had to violate only one of the two deadlines in order for RT Jedburg's right to payment on the Claim to vest. Accepting RT Jedburg's argument, however, would require the Court to effectively render the word "and" a nullity. Well-established principles of interpretation prevent such casual disposal of words in a contract. Moreover, the Court is confident that had the parties intended the disjunctive reading to control, the phrase "and/or" would not have been used, and would instead have been replaced by the word "or."

539 (Bankr. S.D. Ohio 2008). *See Ollilo v. Clatskanie Peoples' Util. Dist.*, 132 P.2d 416, 420 (Or. 1942) ("When this hybrid phrase is used it generally tends towards confusion. Courts struggle with "and/or" to determine what it means and generally end in bewilderment."); *Emp'rs Mut. Liab. Ins. Co. of Wis.. v. Tollefsen*, 263 NW 376, 377 (Wis. 1935) (same).

### 2. The Parties' Intent

Having concluded that the key sentence in the Cure Provision is ambiguous, the Court considers what result the parties intended the Cure Provision to effectuate. Put another way, the Court must construe the disputed provision "to preserve the position for which the parties bargained." *Rosen v. Tenn. Comm'r of Fin. & Admin.*, 288 F.3d 918, 924 (6th Cir. 2002). When determining the intent of the parties to a contract, the Third Circuit has held that "[t]he strongest manifestation of that intent is the wording of the agreement itself." *Nova Chem., Inc. v. Sekisui Plastics Co., Ltd.*, 579 F.3d 319, 323 (3d Cir. 2009).

The Court concludes that, at its core, the Cure Provision was intended to obligate the Debtor to deliver to RT Jedburg a CO for the Premises by October 31, 2008, and to ensure that RT Jedburg would have a claim for damages against the Debtor in the event that the Debtor failed to timely deliver the CO. When analyzing the Cure Provision, the Court finds that the focus of each sentence is the Debtor's procurement of a CO. The first sentence obligates the Debtor to complete all work that is required to obtain a CO. The second sentence identifies the specific government agency that is to issue the CO and the deadline by which the CO must be obtained. The third sentence provides the specific regulations with which the CO must comply. Finally, the fourth sentence ensures, for the benefit of RT Jedburg, that the Debtor will both complete the work required to obtain the CO and actually obtain the CO. While completing all work needed to enable the Premises to receive a CO was a necessary step, based on the language of the Cure Provision, the Court cannot conclude that RT Jedburg bargained for anything other than (or less than) a CO for the Premises by the CO Deadline.

RT Jedburg would therefore be entitled to the Claim if and only if the Debtor failed to deliver the CO by October 31, 2008. A contrary interpretation—based upon RT Jedburg's disjunctive reading of the Cure Provision discussed above—would lead to an absurd result. If the Court were to adopt RT Jedburg's interpretation of the Cure Provision, then the Court would have to find that the parties' bargain included the possibility that RT Jedburg could both receive the CO by the CO Deadline and be entitled to an $8 million claim against the Debtor for failure to meet the Work Deadline. Given the economics of the situation—the fact that the Debtor was in bankruptcy when it negotiated the Agreed Order, and that this possibility would result in a substantial windfall to RT Jedburg—the Court simply has no basis upon which to conclude that the parties (especially the Debtor) negotiated for this potential result.[7] The Court finds therefore that the only result and the only deadline that mattered to the parties[8]—that was enforceable against the Debtor—was the receipt of the CO by the CO Deadline. The Work Deadline provided an intermediate reference point aimed to ensure that the Debtor was on the right track toward meeting the firm October 31, 2008 deadline.

---

[7] As noted, the Court concludes today that a breach of the Work Deadline did not operate to entitle RT Jedburg to an $8 million claim. The Court observes, however, that even if the Agreed Order were construed to provide for that claim, the claim would likely be subject to disallowance under South Carolina law because it is grossly disproportionate to the harm suffered on account of the alleged breach. *See Lewis v. Premium Inv. Corp.*, 568 S.E.2d 361, 363 (S.C. 2002) (Although "[p]arties to a contract may stipulate as to the amount of liquidated damages owed in the event of nonperformance[,] … [w]here … the sum stipulated [to] is plainly disproportionate to any probable damage resulting from breach of contract, the stipulation is an unenforceable penalty.").

[8] The Court also notes that when Mr. Welcker testified about the damages that RT Jedburg would suffer if the Debtor failed to perform under the Agreed Order, he did so specifically in response to questions from counsel for RT Jedburg that addresses the Debtor's potential failure to ultimately obtain the CO. Trial Tr. 60:16-17 ("What would have happened if the work hadn't been done and there had been no CO granted?"), 61:23-25 (asking about potential losses "if the [Premises] did go dark, [ALF] didn't finish their work, they didn't get the CO and you had to find a new tenant"), May 10, 2011.

The Court also finds significant that the Agreed Order lacks a specified means by which RT Jedburg could ensure compliance with the Work Deadline: nothing in the Cure Provision indicates how the Debtor could show that it met the Work Deadline, or alternatively, how RT Jedburg could establish that the Debtor failed to meet the Work Deadline. There is no mention of an inspection relating to the Work Deadline by either RT Jedburg or a third party. [9] Given the sophistication of the parties, the Court has no doubt that had RT Jedburg intended for the Premises to be actually inspected by a certain deadline, such a condition would have been included in the Cure Provision. The Court's conclusion is further bolstered by Mr. Welcker, who testified on behalf of RT Jedburg as to the mootness of the Work Deadline, stating that "since the CO was issued before the October 31st deadline, it clearly is not an issue today." Trial Tr. 30:12-17, May 10, 2011.[10]

### C. § 502(b)(1) Disallowance

By Count II, the Debtor asserts that the Claim should be disallowed pursuant to 11 U.S.C. § 502(b)(1). Section 502(b)(1) of the Bankruptcy Code provides a number of grounds by which a proof of claim may be disallowed, including where "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). Here, the Court has concluded that RT Jedburg is not entitled to payment on the Claim because the Debtor fulfilled its material obligations under the Agreed Order. Accordingly, the Court finds in favor of the Debtor on Count II.

---

[9] The Court further observes that had the parties intended that failure to meet the Work Deadline would, in and of itself, entitle RT Jedburg to payment on the Claim, then the Debtor either would not have admitted to RT Jedburg that it was unable to meet the Work Deadline, or would have ceased work on the Premises to cut its losses (rather than continuing the expend its resources on the necessary construction) knowing that its continued efforts to meet the CO Deadline would not cure its interim default.

[10] In light of the Court's holding today, the Court need not to reach the issue of whether the Debtor actually complied with the Work Deadline.

**D. Attorneys' Fees**

By Count III, the Debtor asserts its right to reasonable attorneys' fees in the event that it prevails with respect to Counts I and II. Here, the Debtor asserts its entitlement to attorneys' fees based upon a provision in the Lease. However, the document that is presently before the Court is the Agreed Order, not the Lease. There is one attorneys' fees provision in the Agreed Order in favor of RT Jedburg, but the Debtor has offered no authority to indicate that this provision should be deemed reciprocal. Accordingly, the Court cannot find in favor of the Debtor with respect to Count III.[11]

## IV. CONCLUSION

The Court concludes that RT Jedburg is not entitled to payment on the Claim on account of the Cure Provision because the Debtor has not materially breached the Agreed Order. For the foregoing reasons, the Court will disallow the Claim and deny the Motion. An appropriate Order follows.

**BY THE COURT**:

Dated: November 2, 2011
Wilmington, Delaware

Brendan Linehan Shannon
United States Bankruptcy Judge

---

[11] In its Memorandum Order of September 17, 2010 [Adv. Docket No. 12], the Court said it would "schedule such further proceedings as may be necessary" to determine the issue of attorneys' fees. (Mem. Or. ¶ 10.) However, the Court finds the record developed at trial and afterwards sufficient to allow it to rule on that issue now, without the need for further proceedings.